**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLISON AMARYLIS ESCALANTE-MARTINEZ,** | ) ) ) | |
| **Petitioner,** | ) ) | **No. 24-cv-4937** |
| **v.** | ) ) ) | **Judge Jeffrey I. Cummings** |
| **NICHOLAS JOSEPH VIGARE,** | ) ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On June 14, 2024, petitioner Allison Amarylis Escalante-Martinez ("Petitioner" or "Allison") filed a petition against Respondent Nicholas Joseph Vigare ("Respondent" or "Nick") for the return of the parties' minor child (hereinafter, "M.V.") to Costa Rica under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention"). Nick opposes Allison's petition. The Court notes from the outset that it is clear from the evidentiary record that both Allison and Nick love M.V. very much, and both believe that they are acting in M.V.'s best interest.

The Convention, to which both the U.S. and Costa Rica are signatories, is designed "to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (cleaned up). However, "[a] Hague Convention case is not a child custody dispute." *Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024), *quoting Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013). "Rather, the purpose of a Convention case is to determine whether a child has been wrongfully removed or retained from his habitual residence and, if so, to order the child's prompt return." *Baz*, 100 F.4th at 865. Indeed, as the Seventh Circuit has held, the "Convention seeks to promote the best interests of the child by entrusting

custody proceedings to the country where the child is at home." *Id*. at 871; *see also Chung Chui Wan v. Debolt*, No. 20-CV-3233, 2021 WL 1733500, at *11 (C.D.Ill. May 3, 2021) ("The Hague Convention is not used to litigate the best interests of a child.").

The Court held an evidentiary hearing on December 15 and 16, 2025,[1] at which the parties presented witness testimony and documentary evidence. The parties also filed post-hearing briefs and this matter became fully briefed on April 8, 2026. (Dckt. ##71, 72). For the reasons set forth below, the Court grants Allison's petition for return of M.V. to Costa Rica.

## I.      STANDARD OF DECISION

Where, as here, an action is "tried on the facts without a jury," Federal Rule of Civil Procedure 52 requires the Court to "find the facts specially and state its conclusions of law separately." Fed.R.Civ.P. 52(a); *see also Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012) ("the trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity."). In doing so, "[t]he Court must explain the grounds" of its decision and otherwise demonstrate a "'reasoned, articulate adjudication.'" *Torres v. Tovar*, No. 22-CV-3806, 2023 WL 5431352, at *1 (N.D.Ill. Aug. 23, 2023), *quoting Aprin v. U.S.*, 521 F.3d 769, 776 (7th Cir. 2008).

In adjudicating Allison's petition, the Court has carefully considered the parties' submissions, the applicable caselaw, the totality of the admissible evidence presented at the hearing, and the weight to be accorded that evidence, including each witness's credibility. In

---

[1] The scheduling of the hearing was delayed (by agreement of the parties) while Petitioner first exhausted her efforts to obtain a visa to travel to the United States. When those efforts were not successful, it took the parties additional time to secure the appropriate translation services. Ultimately, Petitioner offered her testimony through a remote evidence deposition in advance of the hearing and through remote testimony at the hearing.

assessing witness credibility, the Court observed and considered, among other things, "each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony considering the other evidence presented." *Torres*, 2023 WL 5431352 at *1. Moreover, in assessing credibility, the Court notes that it "doesn't subscribe to the view of 'false in one, false in all.'" *Jetel v. Jetel*, No. 3:25-CV-50329, 2025 WL 3043527, at *1 (N.D.Ill. Oct. 31, 2025), *quoting DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839, 870 (N.D.Ill. 2021) ("[T]his Court does not subscribe to that principle and neither does the Seventh Circuit.").

The following represents the Court's findings of fact and conclusions of law as required by Rule 52.

## II.     FINDINGS OF FACT

### A.     The Minor Child's Life in Costa Rica

At some point in 2017 or early 2018, Allison, a citizen of Costa Rica, and Nick, a citizen of the United States, began a romantic relationship after meeting online. (Dckt. #75 ("Evid. Dep. Tr.") at 8). In 2018, the parties learned that Allison was pregnant with their son. During that time, and at all relevant times thereafter, the parties engaged in continued contact through the WhatsApp messaging application. (*See generally* Joint Exhibit ("JX") No. 4). A review of those messages reveals that the parties communicated mostly in English. However, Allison—whose

native tongue is Spanish—testified that she regularly used Google Translate to send messages to Nick in English.  (Hr'g Tr. at 115).[2]

M.V. was born in Costa Rica on November 16, 2018.  (JX No. 1).  Nick traveled to Costa Rica for M.V.'s birth and stayed there to help care for M.V. until January 2019.  (Evid. Dep. Tr. at 10).  Allison and M.V., however, remained in Costa Rica.  Over the course of the next year, Nick regularly provided financial assistance to Allison to help provide for M.V.  Allison and Nick also communicated regularly (seemingly daily) regarding M.V.'s wellbeing, often sharing pictures and information about his health, day-to-day activities, and milestones.  (*See generally* JX No. 4 at 10–174).  Also during this time, Nick—who has been employed by the United States Customs and Border Protection as a K9 officer for the past ten years—gathered information and attempted to assist Allison in obtaining a fiancée visa so that she and M.V. could immigrate to the United States.[3]  (Hr'g Tr. at 153–54; Dckt. #57 ("Joint Stipulations") at 1.)  Nick also obtained a "Consular Report of Birth Abroad," (Respondent's Exhibit ("RX") No. 103), and M.V. maintains citizenship in both Costa Rica and the United States.  (JX No. 3 (Costa Rican Passport) & RX No. 102 (U.S. Passport)).

While in Costa Rica, M.V. resided with Allison and close family members, spent time with additional family and friends, and received routine and necessary medical care.  (*See, e.g.*, JX No. 4 at 27 (3/18/19 visit to "clinica" for "inyeccion"), 45 (5/15/19 visit to clinic for six months vaccines), & 50 (5/27/19 visit related to anemia)).  The evidence also shows that M.V. began attending private school in Costa Rica at some point in 2022 and continued through early 2023.  (*See, e.g.*, *id*. at 249 (Allison states M.V. is starting school in March 2022), 251 (M.V. is

---

[2] The hearing transcript can be located at Docket Nos. 63–66.  When citing to the transcript, the Court cites to the page numbers applied by the Court Reporters, which are continuous across each docket entry.

[3] These efforts did not result in a fiancée visa before Allison and Nick ended their relationship.

"at school" on 4/26/22), 256 (Allison notes M.V. is "studying here" as of 8/10/22), & 260 (Allison states on 1/31/23 that M.V. "studies here"); *see also* Evid. Dep. Tr. at 21 ("he started school around June 2022")).

### B.      The Minor Child's Trips to the United States Between 2020 and Early 2022

Between his birth and early 2022, M.V. traveled to the United States (with Allison's consent) on four separate occasions to spend time with Nick and his family. (JX No. 2; Evid. Dep. Tr. at 14–20). On each such occasion, Nick traveled to Costa Rica, picked up M.V., traveled back with him to Chicago, and then, after the visit, returned M.V. to Allison in Costa Rica. (Evid. Dep. Tr. at 12). Specifically, M.V. first traveled to the United States and stayed with Nick between August 27, 2019 and September 4, 2019, and again from February 1, 2020 through February 5, 2020. (JX No. 2; Evid. Dep. Tr. at 16–18). During these visits, Allison and Nick stayed in continued contact via WhatsApp regarding M.V., his wellbeing, and his activities in the United States. (J.X. No. 4 at 83–90, 145–46)

In April 2020, Allison and Nick ended their romantic relationship. (JX No. 4 at 177; Hr'g Tr. at 216–18). Notwithstanding their break-up, Nick and Allison's messages reflect that they continued to communicate about M.V., and Nick continued to contribute financially for M.V.'s care in Costa Rica. (*See, e.g.*, JX No. 4 at 178–79). Allison and Nick also agreed for M.V. to take additional extended trips to the United States to spend time with Nick. (Evid. Dep. Tr. at 18–20). Specifically, M.V. visited Nick in the United States from October 5, 2020 to December 17, 2020; from April 17, 2021 to July 28, 2021; and from November 22, 2021 to March 1, 2022. (JX No. 2; Evid. Dep. Tr. at 18–20). During these extended visits, M.V. spent time with family and friends, including his grandparents, young cousins, and Nick's then girlfriend (and now wife), Elaine, who is employed at a dental practice in the Chicago area.

5

(Joint Stipulations at 1). Nick also enrolled M.V. in a daycare during these visits so that M.V. could attend on the days Nick had to work. (Hr'g Tr. at 153; RX No. 122). Again, Allison and Nick remained in continued (almost daily) contact during M.V.'s extended visits to the United States between 2020 and early 2022. (*See* JX No. 4 at 197–211, 221–38, 245–49).

## C. Allison and Nick's Communications Leading up to the Minor Child's Trip to the United States in 2023

Shortly after M.V.'s return to Costa Rica in March 2022, Allison learned that Nick cut M.V.'s hair without her permission. (JX No. 4 at 250). This—along with concerns of M.V. calling Nick's girlfriend "Mom"—angered Allison and led to strife between Allison, Nick, and Elaine over the course of the next few months. (*Id*. at 250–55). During this time, Allison did not agree to send M.V. to the United States to visit Nick because she did not respect or trust Elaine. (*Id*. at 254). Allison did maintain, however, that Nick could talk to M.V. and see him whenever he wanted. (*Id*.).

On August 10, 2022, Allison messaged Nick via WhatsApp as follows:

Hey nick I hope you are well . . . I am not working and my savings are disappearing little by little[.] I need you to send me the [M.V.] money from the times you have not sent it please I need to pay for his school and do some tests because it worries me that he does not want to eat and that he sleeps a lot[.] I ask you to be considerate otherwise I will have to take action and talk to a lawyer about your child's alimony here . . .

(*Id*. at 255–56). Allison also presented Nick with certain conditions he must agree to in order for M.V. to travel to the United States, including that: (1) Nick pay the back due child support payments that they agreed upon; (2) Allison would be able to speak to M.V. every day he is in the U.S.; and (3) that M.V. could only stay with Nick in the U.S. for two months because "he is studying" in Costa Rica. (*Id*. at 256). Allison closed this communication with the following: "I

6

will speak with my lawyer to agree on the monthly payment that you will have to send to [M.V.] depends on what you earn at your job . . ." (*Id.*).

Nick did not respond to Allison's message of conditions, and thereafter Allison blocked Nick on WhatsApp for a three-month period between September and mid-December 2022. (*Id.*; Hr'g Tr. at 224). During that time, Nick continued to communicate with and about M.V. through Allison's sister and mother. (Hr'g Tr. at 224).

On December 15, 2022—after three months of no communication on WhatsApp— Allison reached out to Nick requesting to talk about M.V. (JX No. 4 at 256). According to Nick, he spoke with Allison on the phone at that time and she advised him that she was pregnant with her second child and planned to travel to Barcelona, Spain to give birth. (Hr.'g Tr. 225–26). The following day, on December 16, 2022, Allison advised Nick via WhatsApp that she spoke to her lawyer and wanted to "make everything legal." (JX No. 4 at 257). She also told Nick that if he agreed to pay her the back due child support and start sending payments for M.V., she would "probably" let M.V. visit Nick in the U.S. in February. (*Id.*). Nick requested contact information for Allison's lawyer and told her that he would speak to his lawyer as well. (*Id.*).

In the weeks that followed, Allison and Nick continued to discuss the logistics of M.V.'s visit to the United States, including as follows:

> **12/26/22 Nick:** Hey look I want to help you but I need to see [M.V.] too [please] let him come up here to visit me in February
>
> **12/26/22 Allison:** I [tell] u It is not possible in February I already told you later with great pleasure but not in February and if I let him go in February it will only be for a week if that is what you want and then you will bring [him] for me in Barcelona.
>
> . . .
>
> **12/26/22 Nick:** So if I do this, [M.V.] can come visit me and my family here in the US and if I'm flying to Spain to pick him up because of the cost of tickets there and back to the US [M.V.] should [stay] more time here in the US like 6 months

> **12/26/22 Allison:** What drugs or what are you getting into to think as stupidly as you can think of that I'm going to lend you my son for that time, it's only 4 months, take it or leave it anyway, if you really love your son you're going to go wherever he is and it will only be four months . . .

(*Id*. at 257). Nick did not respond to Allison's suggestion of a four-month visit because—according to his hearing testimony—he did not agree to four months. (Hr'g Tr. at 228).

Allison did not travel to Spain in January 2023 and, on January 25, 2023, the parties engaged in the following exchange:

> **1/25/23 Allison:** Can you take [M.V.] in February?
>
> **1/25/23 Nick:** What about April–July? It will be warmer here for him.
>
> **1/25/23 Allison:** Yes but He will start classes and if I send him to school now he will have vacations until July and only for 15 days if that's what you want ok
>
> **1/26/23 Nick:** If I fly to get [M.V.] can you meet me in Panama with him?
>
> **1/26/23 Allison:** Yes

(*Id*. at 258). The parties continued to communicate regarding travel plans for M.V. (among other heated issues related to Elaine), (*id*. at 258–59), and, on January 31, 2023, Allison messaged Nick, in relevant part, as follows:

> **1/31/23 Allison:** . . . In the same way, I send our son to visit you, I don't send him with [Elaine], let it be clear and It's only vacation because he studies here and it's not in a public school. Since [M.V.']s last visit in the U.S. I'm paying for his education here in Costa Rica . . . if I send [M.V.] it's because he misses you and it's only for vacations and I send him whenever I want and for as long as I want please don't make things worse . . .

(*Id*. at 259). In response, Nick promised that M.V. "will be fine." (*Id*.).

On February 5, 2023, a few days prior to M.V.'s trip to the United States, Nick and Allison had the following exchange:

> **2/5/23 Nick:** Can you please pack [M.V.'s] sonic and tales stuffed animals when he comes?

8

**2/25/23 Allison:** . . . why you sand that?

**2/5/23 Nick:** Because I will give them back I just want to play with them with [M.V.] is all lol

**2/5/23 Nick:** I will send them back lol it's nothin bad haha don't be angry

**2/5/24 Nick:** Im excited to see [M.V.] again thank you, I appreciate it

(*Id*. at 260).

> D.      **The Minor Child's Trip to the United States in 2023 and Allison and Nick's Communications Regarding His Return Date**

On February 9, 2023, Nick met Allison and M.V. in Panama and brought M.V. back with him to Chicago. According to Nick, as of February 9, 2023, he had not purchased a return ticket to Costa Rica for M.V. because he was "coming here to the United States for a prolonged period of time." (Hr'g Tr. at 157). In fact, Nick maintained at the hearing that he and Allison *never* had an agreement regarding the length of M.V.'s stay. (*Id*. at 159, 287, 310). For her part, Allison's testimony (on direct and cross), was at times confusing, which the Court attributes (at least in part) to certain issues being lost in translation and the passage of time. Allison did testify, however, that the parties intended and agreed to a four-month visit. (Evid. Dep. Tr. at 34–35).

The evidence from the parties' contemporaneous Whats App messages shows that Nick—contrary to his testimony at the hearing—also communicated his intent and agreement that M.V. would have a four-month visit to the United States. In particular, on February 11, 2023 (two days after M.V. arrived in the U.S.), the parties exchanged the following messages:

> **2/11/23 Allison:** Only 2 months you will have [M.V.] with you no more and if you do not return him to me in two months you will have very big problems
>
> **2/11/23 Nick:** *We agreed on 4 months*
>
> . . .

9

> **2/11/23 Allison:** Just 2 [months] It was never 4 months, you will only have [him] for 2 months, I told you before I took it, it's not like it used to be, he has to study here so you're going to bring [M.V] to be in two months . . .

. . .

> **2/11/23 Nick:** Your words, you can't change them just because your mad.

(JX No. 4 at 262–63) (emphasis added).

Allison and Nick continued to text almost daily while M.V. was in the U.S., including heated exchanges regarding, among other things, Elaine's presence during phone calls between Allison and M.V. (*Id*. at 263–66). This led to Allison texting Nick on February 24, 2023 the following message:

> **2/24/23 Allison:** You're going to give me [M.V.] back next month [March] and if you don't you're going to have very serious problems I don't care you're going to give me back my son at the end of March and I'm not interested in anything you and that b**** are going to s*** you give me back my son . . .

(*Id*. at 266). Nick responded, "Do what you have to do." (*Id*.). Allison continued:

> **2/24/23 Allison:** you're going to send my son to my sister next month [March] it's already settled and you're going to comply and if you don't have money for the tickets I can buy it . . .

(*Id*.). The parties' messages from a few days later, on February 27, 2023, reveal the following exchange:

> **2/27/23 Allison:** You have to bring my son at the end of March or you forget to let him go with you again if you don't comply there will be consequences. Thx
>
> **2/27/23 Nick:** *We had an agreement*, just because you get upset all the time doesn't allow you to violate [M.V.'s] right to spend time with his father.

(*Id*. at 267) (emphasis added). At no point during any of the above exchanges did Nick indicate that he was never going to return M.V. to Allison.

10

On March 8, 2023, after more heated messages about Elaine, Allison said to Nick, "you simply bring my son to them for this month and everyone is happy." (*Id*. at 269). Nick responded the same day with the following:

> **3/8/23 Nick:** [M.V.] will not be down there at the end of the month do what you have to do.

(*Id*.). Again, Nick did not say in this message that he would *never* return M.V. to Costa Rica, only that he would not be doing so at the end of *March*. This is consistent with his message a few weeks prior indicating that the parties agreed to a four-month visit, not a two-month visit.

The next day, March 9, 2023, Allison told Nick that she had "thought about it" and "reflected" and did not "want to hurt [her] son's father." (*Id*.). She continued:

> **3/9/23 Allison:** . . . you will be with my son these four months until June and you will bring him back with me. I have plans to leave the country during that time, so you will have to take [M.V.] wherever I am, be it in Costa Rica or other countries, you will also comply with what was agreed before you took our son and send me the money that we had agreed to monthly.

(*Id*.) Nick responded with gratitude for Allison's consideration, and did not inform Allison that he would *not* return M.V. to her in June. (*Id*. at 269–70).

On March 19, 2023, Allison again told Nick,

> **3/19/23 Allison:** You have until June 15 to bring [M.V.] to me, wherever I am . . . on June 15 I want him back if you do not comply there will be consequences it is just a warning I do not want you to have any problems let along make you suffer and it is better that you put in practice what you promise . . .

(*Id*. at 270). Nick responded, "So you will be moving before June 15th to Spain?" (*id*.), and the parties' exchange continued as follows:

> **3/19/23 Allison:** Look if I go to another country or not, it's not your problem, you don't have to care . . . you just have to bring my son to me on June 15, the 4 months will already be over . . .
>
> **3/19/23 Nick:** If you want to go live in another country it is important for me as a father to know . . . it is my right to know if and when you choose to move. I'm not

going to go into the fact that you did deny me access to [M.V.] from August-December of last year and [M.V.] was supposed to spend that time with me.

**3/19/23 Allison:** I'm not telling you that you're not going to know where [M.V.] is going to be . . . you can go visit him wherever we are. I also said that you could have him on vacation when he's not studying . . . remember that I was the one who decided to send him back and share him these 4 months and we made an agreement that clearly you are not complying with, but it does not matter, I am satisfied that you know that on June 15 you will have to Give [him] back to me, where I am, you're going to have to do it. You know that if you don't comply, you'll have problems . . .

(*Id*. at 270–71). Nick did not tell Allison at that time that he would *not* be returning M.V. on June 15. (*Id*. at 270).

On April 25, 2023, Nick told Allison that M.V. went to the doctor and got routine vaccines, namely "all the normal ones kids in the US get." (*Id*. at 274). In response, Allison requested the vaccine record, stating that "M.V. also lives here in Costa Rica and []he's going to live with me so your doctor has to know that." (*Id*.).

The same day, Allison also told Nick that she was "going to go put the child support order on you." (*Id*.). Allison stated further:

**4/25/23 Allison:** I also want you to know just so that later you don't change the days for any reason when you have to give me my son I filed a lawsuit in case I don't have my son on June 15, day or night but it has to be June 15 If you do not comply, you will have legal problems and that is the reason why I clarify you have to bring me my son to me exactly that day or if you want before but not after June 15 I do not want you to have problems with that so please comply.

(*Id*. at 275).

The parties continued to converse on April 25, 2023 via WhatsApp with Allison requesting Nick's information so that her lawyer could send him "the notice," and asking Nick to speak with his lawyer to "make a voluntary support" so Allison did not have to file a claim for support. (JX No. 4 at 275). The next day, Allison indicated she was on her way to the law office and requested Nick's passport information. (*Id*.).

12

A few weeks later, on May 13, 2023, Allison told Nick, "I'll have my son with me soon so enjoy your last days with him and I hope you already have solved the child support according to the law." (*Id*.). Nick did not indicate at this time that he would not be returning M.V. to Allison. (*Id*.).

### E. Allison's Travels to Spain in May 2023

On May 18, 2023, Allison told Nick, "[O]n Sunday [May 21] I'm going to Barcelona so start[] looking for tickets" and she again reminded Nick of the June 15 date for M.V.'s return. (JX No. 4 at 277). Allison continued,

> **5/18/23 Allison:** I just want you to let me know before Sunday, that is, Saturday, because I already have my plane ticket bought for Barcelona and I can change it and stay in Costa Rica waiting for my son in case you ask me buts, I already have an arrest warrant ready, a lawsuit filed. here in Costa Rica waiting for you I told you that we are going to do legal things according to the law so it better that you do not get in trouble with me and comply with our agreement and what we have already talked about for months

(*Id*.). When pressed at the hearing about this message and other messages threatening lawsuits, Allison denied sending these messages, instead suggesting that her family members may have sent them. (Hr'g Tr. at 67–68).[4] Allison also testified that (despite meeting with a lawyer) she never hired a lawyer or filed any lawsuits in Costa Rica. (Evid. Dep. Tr. at 29; Hr'g Tr. 63). In any event, Nick did not respond to Allison's threats, let alone indicate that he would not be returning M.V. to her on June 15, whether she was in Spain or in Costa Rica.

Allison traveled to Barcelona on May 22, 2023, intending to stay (based on her testimony) until shortly after her daughter's birth. (Hr'g Tr. at 133; Evid. Dep. Tr. 34). According to Nick's testimony, however, on May 22, he spoke with Allison and she "opened up to [him] and stated that she was going to live in Spain and she wanted [him] to bring [M.V.] to

---

[4] The Court does not find Allison's attempt to shift responsibility to family members for these messages to be credible.

Spain so they can live." (*Id*. at 195; *see also* JX No. 4 at 277 (noting an audio call on that date)). According to Nick, he also told Allison during this call that he would not bring M.V. to Spain because it would be "fraud." (Hr'g Tr. at 277–78). The Court, however, does not find Nick's testimony regarding this conversation to be credible. This is so because the parties engaged in subsequent WhatsApp communications that would never have occurred if Nick had made it clear on May 22 that he was not going to bring M.V. back to Allison.

In particular, the very next day, May 23, Nick asked:

> **5/23/2023 Nick:** So you want me to buy a round trip ticket for [M.V.] so it looks like [M.V.] is returning, so Spain immigration doesn't think he is coming to live in Spain with you.

(JX No. 4 at 277). Allison responded, "Si" (or, yes), "Like if he coming for vacation." (*Id*.). Nick then asked Allison if she had "found work, and a place to live." (*Id*.). Allison responded,

> **5/23/2023 Allison:** Now I live [with] my tia and I'm no working of course Because we are only going to stay here for 3 months as soon as [my daughter] is born we return to Costa Rica.

(*Id*. at 278). Allison then confirmed to Nick that her daughter's due date was in August. (*Id*.).

Over the course of the next few weeks, Allison asked Nick if he had bought the tickets to bring M.V. to her in Spain, and she also asked Nick to bring various items to Spain, including medicines, a tablet, a blender, winter clothes, and M.V.'s favorite Coco sweater. (*Id*. at 277–80). Around the same time, the parties also exchanged the following messages about Allison's plans in Spain:

> **5/26/23 Nick:** Did you need a tourist visa or anything do you know?
>
> **5/26/23 Allison:** . . . here [M.V.] has nothing and everything is very expensive while I get out of the pregnancy I will be able to work and earn money now I am living from my savings and with all my heart nick i will need your help and support please for your son. i am living with an aunt and I moved here to Barcelona because my daughter's father is not a good person please this is just between you and me . . .

14

**5/26/23 Nick:** I'm sorry to hear that. So will [your daughter] be a citizen of Espana then? I don't know how it works

**5/26/23 Allison:** Yes she will be Espanola

. . .

**5/31/23 Nick:** Did you ever get the social security thing in Spain you need?

**5/31/23 Allison:** Yes I'm working [on] that

. . .

**5/31/23 Nick:** So [your relatives], and your family knows you moved . . .

**5/31/23 Allison:** Yes my family knows everything . . .

. . .

**5/31/23 Nick:** Did you sell your car in Costa Rica, and everything?

**5/31/23 Allison:** I just want you to know that obviously I couldn't bring anything for [M.V.] or [my daughter] I'm starting from scratch with this new life so at last help me with what [M.V.] is going to need . . . it will be very hard for me for a while but I will do everything possible . . . for now I need you while I get up and get settled I have a few months left before [my daughter] is born . . .

**5/31/23 Nick:** I'm sorry you are going through all of this. It must be hard to leave[] everything behind in Costa Rica and starting a new life in Spain . . .

**5/31/23 Allison:** [M.V.] will have everything he needs here but I just need to go through this and get up . . . I will have a job as soon as I get out of my pregnancy. We will be fine. You just comply with what we had agreed to since our separation and Now as if we were in Costa Rica and don't feel sorry for me I'm a strong woman I just didn't bring anything for any of my children I'll have to buy everything here and it's more expensive than Costa Rica . . .

(JX No. 4 at 279–80). Amidst this exchange, Allison again told Nick the "15th is when you bring me my son," and asked Nick to send her the arrival time. (*Id*. at 280). Nick did not respond that he was not going to bring M.V. to Allison in Barcelona. (*Id*.).

15

**F.      Nick's Refusal to Return the Minor Child to Spain in July 2023 and Thereafter**

According to Allison, at some point prior to June 15, 2023, she and Nick spoke and agreed to extend M.V.'s time in the United States to mid-July.  (Hr'g Tr. at 132).  While this agreement is not expressly reflected in the WhatsApp messages, the parties' messages around this time support Allison's testimony that they discussed a July return date.  Indeed, notwithstanding her typical ire when frustrated with Nick, Allison did not express anger or concern on June 15 when Nick did not bring M.V. to her in Spain, nor in the days immediately thereafter.  Instead, she continued to ask Nick how M.V. was doing and even wished Nick a happy Father's Day.  (JX No. 4 at 281–82).

Moreover, between June 23, 2023 and July 14, 2023, Allison asked Nick approximately ten times about his tickets to Barcelona, including asking for the details about Nick and M.V.'s planned arrival time on July 15.  (JX No. 4 at 282–83 ("please b[u]y the tickets"; "Did u have the flight tickets?"; "Did u already have the ticket I need you to send it to me"; "Enjoy and please s[e]nd me the tiquetes"; "Did you have the [M.V.] ticket"; "[where] is the ticquet I need to know"; "It is obvious that you have to have the tickets ready you only have 2 days left"; "What time is the flight"; "What time u will be here with my son?").  Although Nick never responded to Allison's questions, he likewise never told her that he was not going to bring M.V. to Spain to return him to her custody.  Instead, he continued to send Allison an occasional picture of M.V., while assuring Allison that he was fine.  (*Id.*)

Finally, on July 15, 2023, Nick sent Allison the following message:

> **7/15/23 Nick:** This is to notify you that I will not be flying M.V. to Spain respectfully.  I understand that you have chosen to immigrate to Spain to give birth to your unborn daughter, seek work, and live there.  However, [M.V.] has never been to Spain.  Furthermore, I will not be a part of fraud on your behalf.  I will not buy a plane ticket to Spain, then misrepresent myself to Spanish Immigration, as

> you have requested me to do.  I will not go before Spanish Immigration to mislead Customs, because you want to continue to live in Spain, (a country that you unilaterally moved to.)  I will not facilitate a lie to Spanish Immigration officials on your behalf.  ***I plan to have [M.V.] remain in the United States indefinitely.***

(*Id*. at 283 (emphasis added)).  Allison thereafter sent Nick numerous messages expressing her sadness, pain, and anger regarding Nick's decision not to return M.V. to her, and she continued to demand that Nick bring her son to her in Spain.  (*Id*. at 283–284).  Nick declined to do so and M.V. has remained in Nick's care in the U.S. ever since.

### G.      M.V.'s Time in the United States *after* July 15, 2023

The parties have stipulated to M.V.'s experiences in the United States from July 15, 2023 through the present.  Specifically, M.V. has resided with Nick and Elaine in the Chicagoland area.  He attends elementary school, speaks English in the home and at school, celebrates United States holidays, receives regular medical and dental care, and participates in extra-curricular activities, including baseball and hockey.  (Joint Stipulations at 1–2).  M.V. has also formed meaningful relationships with his extended family, and regularly attends birthday parties and social events of his family and friends.  (*Id*. at 2–3).

### H.      Allison's Return to Costa Rica

Ultimately, Allison's daughter was born in July 2023, and Allison and her daughter returned to Costa Rica one month later, on August 24, 2023, (Hr'g Tr. at 134), where they continue to reside.  Allison filed her petition in this case on June 14, 2023.  (Dckt. #1).  In it, she claims that Nick wrongfully retained M.V. in violation of her custodial rights on July 15, 2023, at which time M.V.'s habitual residence was Costa Rica.  In response to the petition, Nick disputes that he wrongfully retained M.V., asserts that M.V.'s habitual residence was the United States, and otherwise asserts the affirmative defenses of "well-settled" and "subsequent acquiescence." (Dckt. #13).

### III. CONCLUSIONS OF LAW

#### A. General Principles

"Article 12 of the Convention states the general rule that when a court receives a petition for return within one year after the child's wrongful removal [or retention], the court 'shall order the return of the child forthwith.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014) (citing *Abbott v. Abbott*, 560 U.S. 1, 9 (2010)). If, however, "the court receives a petition after "the expiration of the period of one year [from the date of the wrongful removal or retention],' the court must order the return of the child 'unless it is demonstrated that the child is now settled in its new environment.'" *Nolla v. Vargas*, No. 22-CV-1224-PP, 2024 WL 2976749, at *14 (E.D.Wis. June 13, 2024), *quoting Lozano*, 572 U.S. at 5; *see also Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018) (noting that "[t]he Convention treats petitions filed in the first year differently from those filed more than one year after a child is removed").

In the United States, the Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9001 *et seq.* Under ICARA, the petitioner—here, Allison—has the burden of making a *prima facie* showing by a preponderance of the evidence that her child was wrongfully removed or retained away from their habitual residence. 22 U.S.C. §9003(e)(1); *Baz*, 100 F.4th at 865. The Seventh Circuit has articulated a four-factor inquiry to determine whether a petitioner has stated such a *prima facie* case:

> (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?

*Baz*, 100 F.4th at 865–66, *quoting Redmond*, 724 F.3d at 737–38. The Court addresses each of these four questions in turn below.

18

**B.     The Date of Wrongful Retention**

The parties agree that Nick traveled with M.V. to the United States on February 9, 2023 with Allison's consent.  Allison asserts that Nick then wrongfully retained Nick in the United States when he failed to return M.V. to her custody in mid-July 2023.  "Wrongful retentions typically occur [as Allison asserts here] when a parent takes a child abroad promising to return with the child and then reneges on that promise."  *Redmond*, 724 F.3d at 739 n.5.  The date of such a retention can be either "the date consent was revoked" or "when the petitioning parent learned the true nature of the situation."  *Baz v. Patterson*, No. 23 C 5017, 2023 WL 8622056, at *5, (N.D.Ill. Dec. 13, 2023), *aff'd*, 100 F.4th 854 (7th Cir. 2024).  In determining the respective intentions and understandings of Nick and Allison, "the court should look at actions as well as declarations."  *Koch v. Koch*, 450 F.3d 703, 715 (7th Cir. 2006); *BandZius v. Sulcaite*, No. 18-CV-3811, 2018 WL 5018459, at *6 (N.D.Ill. Oct. 15, 2018) (same); *see also Thompson v. Gnirk*, No. 12-CV-220-JL, 2012 WL 3598854, at *11 (D.N.H. Aug. 21, 2012) ("[O]bjective manifestations of parental intent . . . trump any subsequent subjective arguments.") (cleaned up).  "The date on which a wrongful retention commenced is a question of fact" to be determined by the district court.  *Baz*, 100 F.4th at 866.

Here, Allison maintains that the date of wrongful retention for purposes of the Convention was July 15, 2023, when Nick affirmatively expressed to her in writing that he would not be bringing M.V. to Spain and that he would "remain in the United States indefinitely."  For his part, Nick disputes he wrongfully retained M.V. at all and he asserts that Allison knew he was not going to return M.V. to her custody on one or more of three possible dates: (1) March 8, 2023, when Nick told Allison that he was not returning M.V. to Costa Rica at "the end of the month;" (2) April 25, 2023, when Allison informed Nick that she had "filed a

19

lawsuit" in Costa Rica in case she did not have her son by June 15; and (3) May 18, 2023, when Allison told Nick that she had "an arrest warrant ready, a lawsuit filed" in case Nick did not return M.V.[5]  In Nick's view, because Allison failed to file her petition within one year of any of these three possible dates of wrongful retention, she is not entitled to the presumption of return applicable to petitions filed within one year.  *See Nolla*, 2024 WL 2976749, at *15 (noting that for a petitioner to "benefit from Article 12's—for lack of a better word—'presumption' of return, the unlawful removal would have had to take place" within the year prior to the filing of the petition).

Based on the evidentiary record presented during the hearing, the Court finds that the date of Nick's retention of M.V. for purposes of its analysis under the Convention was July 15, 2023.

To begin, there is no dispute that Allison and Nick agreed that M.V. could travel to the United States in February 2023 to spend time with Nick and his family.  Indeed, based upon the messages exchanged by *both* parties, the Court finds that they agreed prior to M.V.'s February 2023 trip to the U.S. that M.V. could stay with Nick in the U.S. for four months, that is, until mid-June 2023.  Subsequently, the contemporaneous messages of Allison and Nick show that they agreed to extend M.V.'s visit by one month, until mid-July 2023.  What happened over the course of those months was a repeated back-and-forth between the parties about the *length* of M.V.'s stay (namely, whether his stay would be shorter or longer than four months) and the logistics of his return to Allison (namely, whether to Costa Rica or Spain).  As outlined above, however, at no point during those back-and-forth exchanges did Nick tell Allison that he would

---

[5] Notably, Nick does not argue in his post-trial brief that Allison should have known that he was not going to return M.V. to her on May 22, 2023—the date he testified that he first told Allison he would not be bringing M.V. to Spain.  The Court will treat Nick's failure to mention this testimony as a waiver of any argument that Allison received notice of his intent to retain M.V. on this date.

not be returning M.V. to Allison at all, nor did Allison demand immediate (as opposed to a future) return of M.V. Moreover, Allison's threats of legal action and an arrest warrant during those exchanges seemed to be just that: empty threats in an abundance of caution, and *not* a revocation of Allison's consent for M.V. to remain in the U.S. for at least a bit longer, or evidence of her knowledge that Nick was not going to return M.V. to her custody.

Instead, it was only on July 15, 2023—when Nick clearly and unequivocally informed Allison that he would not be bringing M.V. to Spain *and* that he would "remain in the United States indefinitely"—that Allison learned the true nature of the situation and Nick's retention of M.V. became wrongful for purposes of the Convention. *See Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019) (holding that for purposes of wrongful retention, the court should look to the date the petitioning parent learned the true nature of the situation, and not to the date the abducting parent formed the intent to wrongfully retain the child); *Betancourt Diaz v. Figueredo*, No. 1:25-CV-05956-SDG, 2026 WL 105019, at *2 (N.D.Ga. Jan. 14, 2026) ("The retention became wrongful on August 22 when, after Petitioner inquired with Respondent about the travel scheduled for that day, Respondent told Petitioner that the children would not be boarding their return flight and would be staying with him in the United States.").

Furthermore, adopting any of Nick's proposed wrongful retention dates (March 8, 2023, April 25, 2023, or May 18, 2023) would defy common sense based on the evidence before the Court. Not only did Nick *not* tell Allison that he would never return M.V. on any of these three dates, but it is clear from Allison's conduct in the months that followed that she had not learned the "true nature of the situation." Instead, as outlined above, she continued to plan for M.V.'s return to her, including asking Nick to bring various items with him and repeatedly requesting

flight details from Nick leading up to the later-discussed July 15, 2023 date. And Nick, too, continued to engage in text messages regarding the logistics of M.V.'s return.

For all these reasons, the Court finds that the date of retention for purposes of the Convention was July 15, 2023, when Nick told Allison that M.V. would remain in the U.S. indefinitely.

### C. The Habitual Residence of the Minor Child

#### 1. Standard for Determining Habitual Residence

Next, the Court must determine M.V.'s "habitual residence immediately before the alleged . . . retention," on July 15, 2023. *Baz*, 100 F.4th at 866 (cleaned up). Although the Convention does not define the term "habitual residence," the Supreme Court recently offered some clarification in *Monasky v. Taglieri*, 589 U.S. 68 (2020). In *Monasky*, the Court expressly rejected the view that habitual residence depends solely on an actual agreement between a child's parents. *Id.* at 77. Instead, "[t]he place where a child is at home, at the time of . . . retention, ranks as the child's habitual residence." *Id.* As the Seventh Circuit more recently confirmed based on *Monasky*:

> Determining where a child was at home at the time of retention is a fact-driven inquiry, not a categorical one. The inquiry must be sensitive to the unique circumstances of the case and informed by common sense. Among the factors to consider are facts indicating acclimatization, which will be highly relevant, and the intentions and circumstances of caregiving parents. But no single fact . . . is dispositive across all cases, and so courts must consider the totality of the circumstances specific to the case to determine a child's habitual residence.

*Baz*, 100 F.4th at 866–67 (cleaned up). As stated above, "the court should look at actions as well as declarations" when considering parental intentions. *Koch*, 450 F.3d at 715.

22

## 2. M.V.'s habitual residence immediately before the date of wrongful retention was Costa Rica.

Here, Allison has met her burden to establish that M.V.'s habitual residence "immediately before" Nick's July 15, 2023 retention of him in the U.S. was Costa Rica. As explained above, M.V. was born in Costa Rica in November 2018 and spent the majority of his early years in Costa Rica, notwithstanding occasional visits (some extended) with Nick in the U.S. In fact, Allison calculates (without dispute by Nick) that between his birth and February 6, 2023, M.V. spent approximately 286 days (less than a year) of 1,500 days (about four years) of his life outside of Costa Rica. The evidence also shows that while in Costa Rica, M.V. lived with his mother and her close family members, often spent time with family and friends, received medical care and, in 2022, began attending school.

And, although Allison and Nick agreed for M.V. to *visit* Nick in the U.S. on multiple occasions over the course of his early years, after each visit (the last visit excluded), Nick returned M.V. to Allison in Costa Rica. Moreover, Allison expressed her intent that the February 2023 visit to the U.S. would be for "vacation," and certainly not for an indefinite relocation. Similarly, Nick's WhatsApp messages manifest his declared intent and understanding that M.V.'s visit to the U.S. was to be a temporary visit. Not only did Nick expressly state that he and Allison had "agreed on 4 months," but after asking Allison to pack M.V.'s Sonic and Tales stuffed animals so that he could use them to play with M.V., Nick promised that he would "give them back." There would be no reason to give the toys back to Allison if M.V. were going to remain indefinitely in the U.S.

On the evidentiary record before the Court, including the declarations and actions of Allison and Nick, the Court finds that Costa Rica was M.V.'s habitual residence at the time of the wrongful retention. *See, e.g.*, *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) (holding that, in

23

deciding the parents' intended residence for the child under the Hague Convention, "the court should look, as always in determining intent, at actions as well as declarations"). And, despite Nick's protestations, M.V.'s occasional extended visits to the U.S. with Nick, including the months between February 2023 and July 15, 2023, do not support a finding to the contrary given that M.V. spent the majority of his life in Costa Rica as of that time. *See Argueta v. Argueta-Ugalda*, No. 22-CV-12840, 2023 WL 1466820, at *8 (E.D.Mich. Feb. 2, 2023) ("[G]iven how strong and continuous her ties have been with Brazil, the Court finds that M.A.'s four months in the United States were not sufficient to acclimate her such that her habitual residence changed."); *see also Bayerlein v. Anderson*, No. 25-CV-1027-JPG, 2025 WL 2193194, at *4 (S.D.Ill. Aug. 1, 2025) (finding habitual residence in Germany for child who lived there for the "first four years of her life, was enmeshed in her German family, attended kindergarten, participated in outside activities, and had friends there"); *Torres*, 2023 WL 5431352, at *6 (finding Mexico to be the habitual residence where, *inter alia*, the child lived there continuously for three years, attended school, and saw medical providers).

This is not to say that M.V.'s time in the U.S.—including the months between February 6, 2023, and the July 15, 2023 retention date—was not meaningful to M.V. Indeed, it is clear that during that time (as with prior visits), M.V. lived with Nick and his wife, spent time with family and friends, attended day care, received medical care, and engaged in extracurricular activities, such as T-ball. Nonetheless, M.V.'s birth and years in Costa Rica "outweigh the time [h]e ha[d] spent in the United States" prior to the date Nick declared that he would indefinitely retain M.V. in the U.S. *Bayerlein*, 2025 WL 2193194, at *4.

What is more, Nick's attempt to rely on M.V.'s undisputed habituation in the United States *after* the July 15, 2023 wrongful retention date is unavailing. As the Seventh Circuit has

24

held, "a parent cannot create a new habitual residence by the wrongful removal and sequestering of a child." *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006); *see also Baz*, 100 F.4th at 876 n.1 (J. Hamilton, dissenting) ("[E]vidence of a child's acclimatization obtained wrongfully should be discounted in any habitual residence determination."). Here, it is literally true that M.V. is sequestered within the United States because Allison cannot obtain a visa to travel to this country[6] and Nick has declared that he will retain M.V. in the United States indefinitely. As such, M.V.'s undisputed habituation to life in the United States *after* the date of his wrongful retention did not alter his habitual residence on the date of the wrongful retention for purposes of the Convention.

### 3. Allison's relocation to Spain did not alter M.V.'s habitual residence.

Finally, for a number of reasons, the Court rejects Nick's argument that Allison's relocation to Spain—which he maintains she intended to be permanent—altered M.V.'s habitual residence from Costa Rica to the United States.[7]

To begin, although "intentions and circumstances of caregiving parents" remain a relevant (though not a dispositive) factor post-*Monasky*, as explained above, courts typically look to the *shared* intent of the parties when considering this factor in the habitual residence analysis. *Olga Sugey Centeno Aguirre v. Hernandez*, 757 F.Supp.3d 1211, 1222 (D.Colo. 2024) ("While *shared* intent is relevant, it is not dispositive.") (emphasis added). Here, Allison's intent to

---

[6] Indeed, the evidentiary hearing in this case was delayed until Allison exhausted her ultimately unsuccessful effort to obtain a visa to travel to the U.S. (Dckt. ##27, 29, 30, 31).

[7] Nick bases his argument that Allison intended to move to Spain permanently on, *inter alia*, her representations that she intended to start over in Spain; her new job; and her intent to sign up for health insurance in Spain. The evidence, however, is mixed on this score. Allison, in her text message, declared that she intended to move back to Costa Rica after the birth of her daughter; she requested that Nick obtain a round trip ticket for M.V. to return to Costa Rica on the same date of her ticket for her return to Costa Rica; she took up residence with her Aunt instead of getting her own place; and she obtained a job that she could perform remotely from either Spain or Costa Rica.

relocate herself and M.V. to Spain was certainly not shared by Nick. Again, the parties' last *shared* intent was that M.V. would travel to the United States in early 2023 for an extended stay with Nick and return to Costa Rica (as he had done on at least three prior occasions). Where, as here, the "child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id*. at 1225 (cleaned up) (citing *Mozes v. Mozes*, 239 F.3d 1067, 10767 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. at 83–85.); *Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018) ("The 'unilateral intent of a single parent' will not suffice to change a child's habitual residence.").

Second, to the extent that Allison intended to move permanently to Spain, her relocation to Spain was entirely conditioned upon Nick's return of M.V. to her custody. To this point, Allison declared to Nick in her May 18, 2023 WhatsApp message that although she had a plane ticket to Barcelona, she would "stay in Costa Rica waiting for [her] son in case" he asked her to do so. (JX No. 4 at 277). Moreover, Allison returned to Costa Rica just one month after giving birth to her daughter after Nick refused to return M.V. to her custody. "[C]ourts have refused to find a change in habitual residence because one parent intended to move to [a] new country of residence on a trial or conditional basis." *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009); *Fernandez v. Somaru*, No. 2:12-CV-262-FTM-29, 2012 WL 3553779, at *9 (M.D.Fla. Aug. 17, 2012) (same) (citing cases); *see also Calixto*, 909 F.3d at 1089 ("Simply stated, the intent to change the habitual residence of a child from one country to another can be conditioned on the ability of one parent to be able to live in the new country with the child."). Thus, neither Allison's conditional move to Spain in May 2023 nor Nick's unilateral intent to change M.V.'s

26

habitual residence to the U.S. changed or impacted M.V.'s habitual residence as of the date of his wrongful retention on July 15, 2023.

Third, Nick provides *no* support for his implicit assertion that Allison's relocation to Spain somehow stripped her of her custodial rights under Costa Rican law as M.V.'s mother. In fact, as discussed below, Allison, as the unwed mother of M.V., had lawful custody over M.V. under Costa Rican law and the record contains no evidence that Nick took the actions necessary under Costa Rican law to obtain parental rights as an unwed father. *See infra* at Section III.D.

Finally, the Court finds that Allison's location on the date of the wrongful retention is immaterial given that there is no evidence in the record that Nick would have returned M.V. to Allison even if she had remained in Costa Rica or offered to return to Costa Rica from Spain immediately, as opposed to staying in Spain. To put it another way, Nick's July 15, 2023 declaration that he was going to retain M.V. in the U.S. "indefinitely" was unqualified and not premised on Allison's presence in Spain.

For all of these reasons, the Court finds based on the totality of the circumstances that M.V.'s habitual residence as of the July 15, 2023 date of his wrongful retention was Costa Rica.

### D. Allison's Custody Rights under Costa Rican Law

Next, the Court must determine whether Allison, as the petitioning parent, had custody rights over M.V. as of July 15, 2023, because "[a] retention is wrongful under the Convention only if it violates the petitioning parent's 'rights of custody,' which 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Baz*, 100 F.4th at 870, *quoting Abbott*, 560 U.S. at 9. Having determined that Costa Rica is M.V.'s habitual residence, the Court looks to Costa Rican law to determine whether Allison had custody rights over M.V. *Baz*, 100 F.4th at 870 ("A parent's rights of custody are

27

determined by the laws of the country in which the child has his or her habitual residence.") (cleaned up). "Article 14 of the Convention authorizes the court to take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof of foreign law." *Martinez Dona v. Perez Castilblanco*, No. 3:17-CV-2469-L, 2018 WL 928976, at *7 (N.D.Tex. Feb. 16, 2018); *Guerrero v. Oliveros*, 119 F.Supp.3d 894, 908 n.4 (N.D.Ill. 2015) (same). Moreover, in interpreting foreign law, the Court "may consider any relevant material or source . . . whether or not submitted by a party." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 585 U.S. 33, 36 (2018); Fed.R.Civ.P. 44.1.

Here, Allison has submitted certain translated provisions of Costa Rican law, and argues that those provisions establish her custody rights. Based on the Court's review of those provisions and relevant case law, the Court agrees.

Generally speaking, Costa Rican law provides that "[p]arents are competent to govern their children, protect them, administer their assets, and legally represent them" and the "rights and obligations inherent to parental responsibility cannot be waived." (PX NO. 2 at 1). However, under Costa Rican law, as courts have previously explained, "parental custody depends on whether a child was born in or out of wedlock." *Fernandez v. Somaru*, No. 2:12-CV-262-FTM-29, 2012 WL 3553779, at *7 (M.D.Fla. Aug. 17, 2012). Where, as here, a child is born out of wedlock, Costa Rican law provides that "[t]he mother, even when she is under age, shall have custody of the children born out of wedlock and shall have legal rights for that purpose." *Id.*; *see also Martinez Dona v. Perez Castilblanco*, No. 3:17-CV-2469-L, 2018 WL 928976, at *7 (N.D.Tex. Feb. 16, 2018) (same, citing Article 157 of the Costa Rican Family Code).

In contrast, fathers to children born out of wedlock are not afforded the same unfettered custody rights under Costa Rican Law. *See Martinez Dona*, 2018 WL 928976, at *7. In

28

particular, an unwed father (like Nick) "only has the right to exercise parental authority together with the mother in special cases, if such authority is conferred by a tribunal or court upon request of a party or the Patronato Nacional de la Infancia and done solely in consideration of the child's interests." *Id.* There is no evidence in the record that Nick took the required steps in Costa Rica to obtain his parental authority under Costa Rican law.

In sum: given these provisions of Costa Rican law, the Court finds that Allison had custody rights over M.V. under Costa Rican law on the date of the wrongful retention and that she has retained these rights to the present day.

### E.     Allison's Exercise of Her Custody Rights

Lastly, under the fourth factor, the Court must consider whether Allison was exercising her custody rights at the time of M.V.'s wrongful retention. "The standard for finding that a parent was exercising h[er] custody rights is a liberal one." *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012). As such "[a] person who has valid custody rights to a child under the law of the country of the child's habitual residence cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal *abandonment of the child.*" *Baz*, 100 F.4th at 871 (emphasis added).

Here, despite her conditional relocation to Spain in May 2023, there is absolutely *no* evidence that Allison engaged in any acts that constitute clear and unequivocal abandonment of her child, M.V. To the contrary, the record is unequivocal that leading up to the July 15, 2023 date of retention (and always), Allison maintained regular contact with M.V. (through Nick), including repeatedly expressing her expectation that he would be returning for her to continue to exercise her custody rights. This evidence is beyond sufficient to establish that Allison was exercising her rights. *See Baz*, 100 F.4th at 871 ("[T]he evidence shows that Baz actively sought to maintain regular contact with A.P. and that she was able to do so. That is enough to establish

29

that she was exercising her rights of custody at the time of the retention.").  As such, the Court finds that Allison was exercising her custodial rights on the date M.V. was wrongfully retained in the United States.

For the foregoing reasons, the Court finds that Allison has established a *prima facie* case of wrongful retention as of July 15, 2023 under the Convention, and the Court next turns to Nick's asserted affirmative defenses.

### F.      Affirmative Defenses

Under the Convention, because Allison has made a *prima facie* case of wrongful retention, the Court must return M.V. to Costa Rica unless Nick can establish one of the exceptions provided for in the Convention.  22 U.S.C.A. §9001(a)(4).  "The Court must construe all the defenses narrowly to effectuate the purposes of the Convention, and even where a defense applies, the Court has discretion to order the Child[]'s return."  *Guerrero*, 119 F.Supp.3d at 908 (citing *Walker*, 701 F.3d at 1123).  Nick asserts two affirmative defenses: (1) the well-settled exception and (2) the "subsequent acquiescence" exception.  The Court will address each in turn.

#### 1.      The well-settled exception does not apply under the facts here.

"The well-settled defense may be asserted only when an "action [is] not commenced within one year of the [retention]."  *Luis Alfonso V.H. v. Banessa Cristina A.Z.*, 512 F.Supp.3d 633, 644 (W.D.Va. 2021) (cleaned up).  "The [retaining] parent bears the burden of showing, by a preponderance of the evidence, that the action was not commenced within one year of the [retention] and that the child is well-settled."  *Id.*  Here, because Allison filed her petition on June 14, 2024, within one year of the wrongful retention on July 15, 2023, the well-settled exception does not apply.

### 2. Allison did not acquiesce to Nick's retention of M.V.

Under Article 13 of the Convention, the Court is not required to return M.V. if Nick can establish by a preponderance of the evidence that Allison "consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a). "Acquiescence is implicated if a petitioning parent agrees to or accepts a removal or retention after the fact." *Walker*, 701 F.3d at 1123. "Unlike consent, acquiescence must be formal," *id*., and requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time," *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996). "The acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." *Guerrero*, 119 F.Supp.3d at 909.

Nick argues that Allison's relocation to Spain (which occurred in May 2023) amounts to her acquiescence to Nick's retention of M.V. in the United States. Not so. To begin, as explained above in Section III.C.3, Allison's relocation to Spain was conditioned on her ability to reside in Spain with M.V. Moreover, Nick ignores the ample evidence in the record demonstrating Allison's utter lack of acquiescence to M.V. indefinitely remaining in the U.S. with Nick. Again, leading up to the July 15 return date, Allison repeatedly asked Nick for his travel arrangements to return M.V. to her custody and threatened legal consequences if he did not do so. When Nick declared on July 15 that M.V. would remain in the U.S. indefinitely, Allison repeatedly expressed her anger and frustration and demanded that Nick return M.V. to Allison. What is more, only one month after the birth of her daughter, Allison returned to Costa Rica in August 2023 and thereafter began the legal process to achieve the return of M.V., ultimately resulting in this case.

31

Nick has failed to point to any countervailing evidence, let alone sufficient evidence to prove by a preponderance of the evidence, that Allison had a subjective intent to acquiesce to Nick's indefinite retention of M.V. in the United States. *See, e.g.*, *Guerrero*, 119 F.Supp.3d at 910 (finding no acquiescence where "the evidence overwhelmingly demonstrates that Petitioner's subjective intent was to get the Children back.").

**CONCLUSION**

For the foregoing reasons, the Court finds that Petitioner has met her burden to show that M.V. was wrongfully retained in the United States and that Respondent did not meet his burden to show that any affirmative defenses apply. Accordingly, the Court grants Petitioner's petition for the return of M.V. to Costa Rica. The parties shall be "prepared for prompt compliance with this decision, as required by the Hague Convention." *Torres v. Tovar*, No. 22-CV-3806, 2023 WL 5431352, at *9 (N.D.Ill. Aug. 23, 2023). To this end, counsel are directed to meet and confer by June 23, 2026, to determine reasonable conditions and a timetable to effectuate this decision. By June 25, 2026, the parties shall email a proposed order to this Court's proposed order inbox specifying the time, manner, logistics, and date of M.V.'s return to Costa Rica. An in-court status hearing is set for July 2, 2026, at 11:00 a.m. to discuss the issue of petitioner's request for costs.

**DATE: June 16, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**